# Exhibit 1

Electronically Filed - Jackson - Independence - December 08, 2020 - 10:42 PM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT INDEPENDENCE**

| | |
|---|---|
| MICHAEL KITCHEN, | ) |
| | ) |
|     c/o Keenan & Bhatia, LLC | ) |
|     929 Walnut St., Ste. 5107 | ) |
|     Kansas City, MO 64106 | ) |
| | )    Case No. _____ |
|     *Plaintiff*, | ) |
| | )    Division _____ |
|     v. | ) |
| | ) |
| KANSAS CITY AREA TRANSPORTATION | ) |
| AUTHORITY, | ) |
| | ) |
|     Serve: Person in Charge of Office | ) |
|     1200 E. 18 St. | ) |
|     Kansas City, MO 64108 | ) |
| | ) |
|     *Defendant*. | ) |

**PETITION**

Plaintiff Michael Kitchen states the following on personal knowledge as to his own acts and observations, and on information and belief following reasonable investigation as to all other matters.

**THE PARTIES**

1.    Plaintiff Michael Kitchen ("Kitchen") resides in Kansas City, Missouri, and is a citizen of Missouri. He was formerly employed by Defendant.

2.    Defendant Kansas City Area Transportation Authority ("KCATA") is a public entity that formerly employed Kitchen. KCATA is a citizen of Missouri.

**JURISDICTION AND VENUE**

3.    Plaintiff Michael Kitchen previously was employed by KCATA. He was an employee, and Defendant was an employer, within the meaning of the relevant laws at issue here.

1

4.      This Court has subject matter jurisdiction, as this is a civil case.

5.      This Court has personal jurisdiction as the relevant events occurred in Missouri.

6.      Venue is proper as the relevant events occurred in Jackson County.

## FACTS

7.      Plaintiff Michael Kitchen is a 59-year-old Black man.

8.      On August 31, 2017, the KCATA hired Kitchen for the Senior Labor Relations Manager position.  Kitchen was 55 years old at the time.

9.      Chief Human Resources Officer Teresa Bing (a White female) and Deputy Chief Executive Officer Sam Desue (a Black male) hired Kitchen into the position.

10.     As Senior Labor Relations Manager, Kitchen's day-to-day job duties included overseeing the grievance process involving the union that represents many of KCATA's workers, reviewing provisions of the collective bargaining agreement whenever there were disagreements on interpretation, facilitating trainings on sexual harassment and discrimination for managers and front-line employees, and conducting internal investigations.

11.     At the end of 2017, Chief Human Resources Officer Bing also asked Kitchen to assist in evaluating and responding to requests for reasonable job accommodations because Kitchen had extensive experience with the process from his previous employment with the City of Kansas City.

12.     In or about January 2018, because of a reorganization, KCATA changed Kitchen's title to Manager of Labor Relations.  Kitchen's job duties remained the same but KCATA reassigned Kitchen to report to General Counsel Patrick Hurley, a White male.

2

13.     In around March or April of 2018, KCATA hired Sherri Shinkle, a White female, into the Benefits Specialist position in the human resources department.  Benefits Manager Libby Lynch, a White female, interviewed and hired Shinkle.

14.     Shinkle's hiring was not without issue:  Human Resources Recruiter Amy Chambers complained to Chief Human Resources Officer Bing that Benefits Manager Lynch did not conduct a legitimate interview for Shinkle.

15.     Specifically, Lynch did not ask Shinkle any standard interview questions. The interview only centered around Lynch, who had a prior relationship with Shinkle, discussing non-work related matters and offering Shinkle the position.

16.     Shinkle did not have good relationships with Black employees at KCATA.

17.     Within the first month of Shinkle's employment, Shinkle engaged in a loud shouting match at a human resources staff meeting with another human resources employee, Tiffini Davis (a Black female).

18.     In September 2018, Chief Human Resources Officer Bing resigned.

19.     Deputy Chief Operating Officer Sam Desue, a Black man, called Kitchen into his office and told Kitchen that he wanted to consider him for the Chief Human Resources Officer position.  Kitchen told Desue that he was interested in the position and looked forward to speaking with Desue about it.

20.     But in February or March 2019, KCATA promoted Shinkle to the Chief Human Resources Officer position even though Kitchen had more relevant experience and was more qualified for the position.  General Counsel Hurley (a White man and Kitchen's direct supervisor) participated in the selection process.

21.     In around March or April of 2019, KCATA hired a Black female employee named Sharise (last name unknown) into the position of Benefits Manager. Sharise reported to Shinkle.

22.     Sharise abruptly resigned her position after only two to three months.

23.     At the time Sharise left, she informed Jewell Dodd, a Black female reporting to Shinkle, that Shinkle did not like Dodd and would never promote Dodd despite Dodd's qualifications.

24.     KCATA eventually replaced Sharise with a White man named Michael Collision.

25.     In around April or May 2019, KCATA awarded Carla Mann, a Black woman, a trial period in a Benefits/Insurance Clerk position.

26.     KCATA sometimes awarded prospective employees a twenty-day "trial period" for a position during which they had an opportunity to demonstrate their ability to perform the job. If an employee successfully completed the trial period, they would be officially awarded the position.

27.     In Mann's case, Shinkle decided to demote Mann back to her previous position after Shinkle determined that Mann had not successfully demonstrated the ability to perform the job duties.

28.     Mann challenged the determination that she did not successfully complete the trial period and also challenged being required to undergo a trial period in the first place instead of being awarded the job without a trial period.

29.     Kitchen assisted in handling Mann's complaint.

30.     After looking into Mann's complaint, Kitchen informed General Counsel Hurley that he did not believe the facts supported Shinkle's decision.

31.     Kitchen engaged in protected activity by raising his concerns about Mann's demotion: this involved a White woman passing over a qualified Black woman for a job.

4

32.     Hurley and Shinkle became upset with Kitchen and excluded him from any discussions regarding Mann's complaint going forward.

33.     In around August or September of 2019, KCATA was considering the situation of Bus Operator Lori Porter, a Black female who alleged that KCATA unjustly terminated her due to management's failing to provide her with a reasonable job accommodation.

34.     Based on the information presented during the hearing and Kitchen's extensive experience with the accommodations process, Kitchen informed Shinkle that he was concerned about the management's failure to attempt to accommodate Porter's disabilities.

35.     Human Resources Assistant Debbie Moore, a White woman, stated that she did not think to offer Porter an opportunity to be considered for the Part-time Human Resources Assistant position because Moore had forgotten about it.

36.     Kitchen stated that the KCATA would be required to explain why Porter was not considered for other vacant positions that she was otherwise qualified to hold should Porter's case result in a legal proceeding, which Kitchen believed it would.

37.     Shinkle became very upset and told Kitchen that she did not agree that the disability laws required an employer to offer a disabled employee another job.

38.     As a result of Shinkle's disagreement with Kitchen's position on Porter's case, Shinkle called Kitchen into a meeting with Senior Vice President of Administration Michael Graham.

39.     During the meeting, Shinkle was very upset and adamantly stated to Graham that the law does not require an employer to offer a disabled employee a different job as a reasonable accommodation.

40.     Graham told Kitchen and Shinkle that he would need to think about the issue.

41.     After that meeting, Shinkle did not speak to Kitchen unless it was absolutely required, and even then, Shinkle spoke in a curt and unfriendly manner.

42.     Shinkle's change in attitude also followed Kitchen having spoken up to Shinkle regarding the need to give more opportunities to a highly-qualified Black woman with a master's degree, Jewell Dodd  Shinkle had not been giving Dodd the opportunities she gave to White workers.

43.     At some point several weeks later, Kitchen learned that KCATA was going to allow Porter to take the written/skills examination for a part-time Human Resources Assistant position.

44.     Porter failed to achieve a minimum passing score in two of the four sections of the test (one of those sections being typing) and KCATA deemed her unqualified for the position.

45.     Porter challenged KCATA's decision, arguing that she should have been offered the twenty-day trial period in which she would have had the opportunity to demonstrate her ability to perform the job and retest in the two sections she did not receive a passing mark.

46.     Additionally, Porter questioned why she was not considered for a full-time vacant position in the Call Center.

47.     Kitchen discussed this with Hurley and Shinkle.

48.     Regarding the view that KCATA should have awarded Porter a trial period, Kitchen stated that a review of how the issue had been handled in the past showed that several employees within the Union's Office-Clerical Seniority Unit had been awarded a trial period even after not passing all sections of the written/skills examination.  None of these employees was disabled like Porter.

49.     Regarding the vacant position within the Call Center, Kitchen informed Hurley and Shinkle that he believed that KCATA's failure to consider Porter for that position was problematic

6

since KCATA had offered other Bus Operators a position in the Call Center after they were physically unable to obtain their required DOT Medical Certificate.

50.     In approximately October 2019, KCATA decided that Porter would be considered for the Call Center position.  However, KCATA would require Porter to successfully pass at least three or four of the five sections of the written/skills examination.

51.     Porter again challenged KCATA's decision:  Why would KCATA require Porter to pass the written/skills examination when KCATA placed a male Bus Operator into a Call Center position without requiring him to take the test?

52.     Kitchen informed Shinkle and Hurley of this.  Kitchen told Shinkle and Hurley that he was concerned that requiring Porter to pass the written/skills examination could be problematic because KCATA had placed a male Bus Operator into the position without requiring him to take the test.

53.     Kitchen was also leading the team that was reviewing and revising KCATA's written/skills tests for office/clerical positions.

54.     The team determined that the Call Center's written/skills examinations were outdated and did not accurately measure candidates' potential to successfully perform the job duties required.

55.     Kitchen told Shinkle and Hurley that he believed that if KCATA was going to require Porter to take the written/skills examination, KCATA should require Porter and all future Call Center candidates to take the revised test that Kitchen and his team were in the final stages of completing.

56.     The new Call Center written/skills test was going to replace the old exam's typing test with a new test to measure a candidates' keyboard skills.

7

57. Once Hurley and Shinkle learned this, they were adamant that Porter be required to take the old test, which included the typing test.

58. Kitchen expressed his concern that KCATA could be denying Porter a reasonable accommodation by requiring her to pass a typing test that KCATA had just determined was not relevant to the position.

59. Shinkle and Hurley were upset that Kitchen was taking the position that KCATA should administer the new written/skills test to Porter.

60. After that, Shinkle and Hurley excluded Kitchen from meetings regarding the Porter matter.

61. In December 2019, Shinkle and Hurley called Kitchen into a meeting; an attorney representing KCATA was also present and participated.

62. During the meeting, Shinkle and Hurley told Kitchen that they had determined that Porter would be required to take and pass the old Call Center test.

63. Kitchen informed them that he had discussed the Porter matter with Deputy Chief Executive Officer Jameson Auten, a Black man, and that Auten had instructed Kitchen to communicate that KCATA would award Porter a trial period in the Call Center without requiring her to take the written/skills test.

64. KCATA informed Call Center Manager Jennifer Foster of Auten's decision and instructed her to provide Porter with clear expectations and standards that she would be required to meet in order to successfully pass the trial period and be awarded the position on a permanent basis.

65.     Hurley was surprised and upset to hear about Kitchen's conversation with Auten and said that Auten's decision could not be allowed to stand because KCATA would never be able to "get rid of" Porter if she was awarded a trial period.

66.     In September 2019, Shinkle and recently hired Human Resources Recruiter Dennis Crego (a younger White male) inexplicably began attending Kitchen's one-on-one meetings with his supervisor, Hurley.

67.     Kitchen was uncomfortable with having others attend his one-on-one meetings, as they had previously been used to allow him and Hurley to review labor relations issues (union grievances and complaints, management's responses, etc.) and for Kitchen to receive feedback regarding his performance.

68.     There was no reason for Shinkle, who was not responsible for labor relations, and Crego, a newly hired recruiter, to attend these one-on-one meetings.

69.     Shinkle was monitoring Kitchen.

70.     In around September or October of 2019, Jewell Dodd and Tiffani Davis, two of Kitchen's Black female coworkers, informed Kitchen that Shinkle was telling people that Kitchen should be supporting decisions made by upper management and not questioning those decisions.

71.     In November 2019, Workers' Compensation/Risk Manager Keith Rosenblum told Kitchen to start looking for a new job.  Rosenblum's statements made it clear that he had been present when others were discussing Kitchen and his employment status.

72.     At around the same time, Bus Operator R.A. (a Black woman) requested reasonable accommodations after she was unable to pass her DOT Medical Certification due to non-work related mental health issues.

73.     Kitchen attended a meeting in Shinkle's office with Deputy Chief Executive Officer Jameson Auten and Human Resources Recruiter Dennis Crego regarding R.A.'s work status and accommodations request.

74.     During the meeting, Shinkle stated that since R.A.'s disability was related to a mental condition, R.A. was not covered under the disability laws.

75.     Kitchen informed Auten that he believed that the law *did* cover individuals with psychological/psychiatric conditions.

76.     In response, Shinkle printed out information about disability law and said that it supported her statement that mental conditions were not covered.

77.     After reviewing the document, Kitchen showed Auten where the provision cited by Shinkle went on to include mental conditions, and included a list of various mental conditions covered by the law.

78.     Auten reviewed the provision and said, "Okay, that's all I needed to know," and left Shinkle's office.

79.     After Auten left Shinkle's office, Kitchen began to say something to Shinkle regarding the disabilities laws.

80.     Shinkle raised her hand in the air and yelled, "I don't want to hear anymore. You've said enough.  Get out of my office!"

81.     Soon after this incident, in November 2019, Hurley informed Kitchen that Kitchen was being involuntarily transferred to another office in a different building on the KCATA campus.

82.     Kitchen's new office was much smaller than his original office and could not hold all of the files that Kitchen needed and had stored in his previous office.

83.    This new office was also located much further away from the employees and departments that Kitchen spent the vast majority of his time working with.

84.    KCATA's involuntary transfer of Kitchen made it more difficult for Kitchen to do his job.

85.    In December 2019, KCATA underwent another reorganization.

86.    KCATA informed Kitchen that the Labor Relations Department was being moved into the Human Resources Department and that Kitchen would be reporting to Chief Human Resources Officer Shinkle.

87.    KCATA's reassignment concerned Kitchen based on past interactions that he had with her and Shinkle's past interactions with other Black employees

88.    Once KCATA reassigned Kitchen to report to Shinkle, KCATA involuntarily transferred him to a new office again.  Kitchen's new office was located in the Human Resources Department.

89.    Kitchen's office was small and had no file cabinets, so Kitchen had to work out of cardboard boxes.

90.    In late January 2020, Hurley presented Kitchen with a written warning.  Hurley alleged that during a one-on-one meeting when Hurley asked Kitchen to draft a last chance agreement for an employee, Kitchen stated that Hurley should "do it himself."

91.    Earlier that month, Hurley had approached Kitchen and asked, "Do you remember a meeting we had two or three weeks ago when I was on a phone call and asked you to draft a last chance agreement for Brian Gibson?"

92.    Kitchen had replied that he did not remember anything specific about the meeting Hurley was referring to.

11

93.     Hurley had then asked Kitchen if he had said, "Why don't you do it yourself?"

94.     Kitchen replied that he had never and would never say such a thing. Kitchen went on to explain that drafting last chance and other settlement agreements were part of his job duties, so he would have no reason to ever say such a thing.

95.     At the time, Hurley's unsure tone indicated that Hurley himself did not remember whether or not Kitchen made the alleged statement.

96.     But when Hurley presented Kitchen with the written warning, Hurley said that he had clearly heard Kitchen make the statement.

97.     Kitchen asked Hurley why he waited so long to bring up the allegation, but Hurley had no answer.

98.     Kitchen explained to Hurley that he never made the statement Hurley was writing him up for.

99.     Hurley told Kitchen that he had spoken with Shinkle and Crego, who were at the meeting (even though, again, there was no reason for them to be there), and they immediately confirmed that they had heard Kitchen make the statement.

100.    Kitchen again told Hurley that it made no sense for him to make such a statement since he had been drafting such agreements as a regular part of his job.

101.    Kitchen never made the statement that KCATA was writing him up for.

102.    KCATA never conducted a neutral investigation into Hurley's claim. Hurley acted as the investigator, fact-finder, and discipliner for his own complaint, which was highly improper.

103.    After Hurley gave Kitchen a written warning, Shinkle and Crego stopped attending Kitchen's one-on-one meetings with Hurley.

104.     Shinkle and Crego only attended these meetings to find a way to write Kitchen up and paper his file, which they accomplished.  They had no reason to continue attending.

105.     In February 2020, Kitchen responded to an email message sent by Risk Manager Kelley Merrick (a White woman) to him and several other management staff regarding a Bus Operator's failure to report to a temporary transitional duty assignment while he was being treated for a workplace injury.

106.     Kitchen's email response questioned whether the Bus Operator was permitted to refuse a transitional duty assignment.

107.     Kitchen's response was sent to everyone included in Merrick's email message (he replied all).

108.     After Kitchen sent his reply, Merrick, who was clearly angry when she came into the Human Resources office, interrupted a conversation Kitchen was having with other employees and demanded that he come to her office.

109.     As they were walking towards Merrick's office, she was walking really fast and was several steps in front of Kitchen.

110.     When Kitchen arrived at Merrick's office door, and before he could fully enter her office, Merrick began to yell at Kitchen.  She shouted that he needed to stop sending email messages and that he did not know what he was doing.

111.     Kitchen calmly told Merrick that he did not appreciate that she was yelling at him.

112.     Merrick said, "I don't care," and told Kitchen to get out of her office.

113.     Jill Spurling, a coworker whose work space was located approximately 30-50 feet outside of Merrick's office, overheard Merrick yelling.

114.    Spurling told Kitchen that she just hoped that other employees did not associate her with Merrick, and that she was sorry that Kitchen had to be subject to what had occurred.

115.    Kitchen reported the incident to Shinkle, who was his direct supervisor.

116.    Merrick, who had recently been hired into her position, had established a pattern of speaking to non-White employees in a rude and disrespectful manner.

117.    Shinkle told Kitchen that his complaint would be properly addressed and investigated.

118.    An outside attorney whom the KCATA had previously used in other investigations called Kitchen and left him a message asking that he contact her.

119.    Kitchen returned the attorney's call and left a message asking for a return call.

120.    The attorney never called Kitchen back and the incident was never addressed.

121.    KCATA never informed Kitchen of any conclusion to the investigation and KCATA never disciplined Merrick for her behavior.

122.    In February 2020, KCATA went through yet another reorganization.

123.    KCATA informed Kitchen that he would be reporting to Vice President Susan Miller, a White woman.

124.    KCATA's decision to have Kitchen report to Miller was confusing because Miller did not possess any prior experience dealing with labor relations issues or working with labor unions.

125.    KCATA was requiring Kitchen to report to a less-qualified White woman.

126.    On March 12, 2020, Deputy Chief Executive Officer Auten and Senior Vice President of Administration Graham called Kitchen into a meeting in Auten's office.

127. They told Kitchen that KCATA was eliminating Kitchen's position immediately; they said it was because of budget issues.

128. KCATA terminated nine other employees on March 12, 2020:

    a. Tommie Allison (Black, female, 64)

    b. Ginny Kidd (White, female, 77)

    c. Bill Spies (White, male, 71)

    d. Marvino Gilliam (Black, male, 59)

    e. Jewell Dodd (Black, female, 24)

    f. Mark Barton (White, male, 56)

    g. Jill Spurling (White, female, 47)

    h. Randall Hundley (Black, male, 56)

    i. [Name unknown] (Race unknown, sex unknown, 65)

129. KCATA did not actually eliminate Kitchen's position.

130. KCATA reassigned all of Kitchen's job functions to one person: Dennis Crego, a White man who is younger than and less qualified than Kitchen.

131. Crego was the employee whom Shinkle brought along with her to Kitchen's one-on-one meetings with Hurley.

132. Shinkle was grooming Crego to replace Kitchen.

133. Kitchen has suffered damages, including loss of pay and fringe benefits and emotional distress, as a result of Defendants' actions.

134. Defendants acted with willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard, in that Defendants allowed bias and stereotypes to affect their actions.

135.    Kitchen filed a Charge of Discrimination with the EEOC and Missouri Commission on Human Rights, and has received a right-to-sue letter from the EEOC.

## CLAIMS

### COUNT I
### Violation of the Rehabilitation Act
### 29 U.S.C. § 701 et seq.
### Retaliation

136.    Kitchen incorporates each and every foregoing and succeeding paragraph of this Petition as if fully set forth here.

137.    Kitchen was an employee, and KCATA was an employer, within the meaning and coverage of the Rehabilitation Act, because KCATA receives federal funding.

138.    Kitchen associated with and stood up for the rights of disabled employees protected by the Rehabilitation Act.

139.    Thereafter, KCATA retaliated against Kitchen, including but not limited to moving his office, reassigning him to new supervisors, shutting him out of the work environment, and ultimately terminating him.

140.    KCATA has acted in reckless disregard of Kitchen's rights and/or with evil motive, justifying an award of punitive damages, as KCATA knew of Kitchen's exercise of his rights, knew of the law, and still retaliated against him.

141.    Kitchen respectfully prays that this Court adjudge Defendant liable for retaliation in violation of the Rehabilitation Act, and grant all relief allowed under the law, as set forth in the Prayer in this Petition.

**COUNT II**
**Violation of the Rehabilitation Act**
**29 U.S.C. § 701 et seq.**
**Associational Discrimination**

142.     Kitchen incorporates each and every foregoing and succeeding paragraph of this Petition as if fully set forth here.

143.     Kitchen was an employee, and KCATA was an employer, within the meaning and coverage of the Rehabilitation Act, because KCATA receives federal funding.

144.     Kitchen associated with and stood up for the rights of disabled employees protected by the Rehabilitation Act.

145.     Thereafter, KCATA discriminated against Kitchen, including but not limited to moving his office, reassigning him to new supervisors, shutting him out of the work environment, and ultimately terminating him.

146.     KCATA has acted in reckless disregard of Kitchen's rights and/or with evil motive, justifying an award of punitive damages, as KCATA knew of Kitchen's exercise of his rights, knew of the law, and still discriminated against him.

147.     Kitchen respectfully prays that this Court adjudge Defendant liable for associational discrimination in violation of the Rehabilitation Act, and grant all relief allowed under the law, as set forth in the Prayer in this Petition.

**COUNT III**
**Violation of the Americans with Disabilities Act As Amended**
**42 U.S.C. § 12101 et seq.**
**Retaliation**

148.     Kitchen incorporates each and every foregoing and succeeding paragraph of this Petition as if fully set forth here.

149. Kitchen was an employee, and KCATA was an employer, within the meaning and coverage of the Americans with Disabilities Act, As Amended ("ADAAA").

150. Kitchen associated with and stood up for the rights of disabled employees protected by the ADAAA.

151. Thereafter, KCATA retaliated against Kitchen, including but not limited to moving his office, reassigning him to new supervisors, shutting him out of the work environment, and ultimately terminating him.

152. KCATA has acted in reckless disregard of Kitchen's rights and/or with evil motive, justifying an award of punitive damages, as KCATA knew of Kitchen's exercise of his rights, knew of the law, and still retaliated against him.

153. Kitchen respectfully prays that this Court adjudge Defendant liable for retaliation in violation of the ADAAA, and grant all relief allowed under the law, as set forth in the Prayer in this Petition.

**COUNT IV**
**Violation of the Americans with Disabilities Act As Amended**
**42 U.S.C. § 12101 et seq.**
**Associational Discrimination**

154. Kitchen incorporates each and every foregoing and succeeding paragraph of this Petition as if fully set forth here.

155. Kitchen was an employee, and KCATA was an employer, within the meaning and coverage of the ADAAA.

156. Kitchen associated with and stood up for the rights of disabled employees protected by the ADAAA.

18

157.    Thereafter, KCATA discriminated against Kitchen, including but not limited to moving his office, reassigning him to new supervisors, shutting him out of the work environment, and ultimately terminating him.

158.    KCATA has acted in reckless disregard of Kitchen's rights and/or with evil motive, justifying an award of punitive damages, as KCATA knew of Kitchen's exercise of his rights, knew of the law, and still discriminated against him.

159.    Kitchen respectfully prays that this Court adjudge Defendant liable for associational discrimination in violation of the ADAAA, and grant all relief allowed under the law, as set forth in the Prayer in this Petition.

**COUNT V**
**Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e et seq.**
**Race Discrimination**

160.    Kitchen incorporates each and every foregoing and succeeding paragraph of this Petition as if fully set forth here.

161.    Kitchen was an employee, and KCATA was an employer, within the meaning and coverage of Title VII of the Civil Rights Act of 1964.

162.    Kitchen is Black.

163.    Kitchen was qualified for his position and was performing his position to the reasonable expectations of KCATA.

164.    KCATA discriminated against Kitchen, including but not limited to moving his office, reassigning him to new supervisors, shutting him out of the work environment, and ultimately terminating him.

19

165.     The circumstances suggest discrimination, as Kitchen was not treated as well as similarly-situated White coworkers, who received promotions despite not being as qualified. Further, the accusations leveled against Kitchen were false and pretextual.

166.     KCATA has acted in reckless disregard of Kitchen's rights and/or with evil motive, justifying an award of punitive damages, as KCATA knowingly engaged in discrimination.

167.     Kitchen respectfully prays that this Court adjudge Defendant liable for race discrimination in violation of Title VII, and grant all relief allowed under the law, as set forth in the Prayer in this Petition.

**COUNT VI**
**Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e et seq.**
**Retaliation**

168.     Kitchen incorporates each and every foregoing and succeeding paragraph of this Petition as if fully set forth here.

169.     Kitchen was an employee, and KCATA was an employer, within the meaning and coverage of Title VII of the Civil Rights Act of 1964.

170.     Kitchen opposed actual and/or reasonably-suspected racial discrimination.

171.     Kitchen was qualified for his position and was performing his position to the reasonable expectations of KCATA.

172.     KCATA retaliated against Kitchen, including but not limited to moving his office, reassigning him to new supervisors, shutting him out of the work environment, and ultimately terminating him.

173.     The circumstances suggest retaliation, as Kitchen was not treated as well as similarly-situated non-complaining coworkers, who received promotions despite not being as qualified. Further, the accusations leveled against Kitchen were false and pretextual.

20

174. KCATA has acted in reckless disregard of Kitchen's rights and/or with evil motive, justifying an award of punitive damages, as KCATA knowingly engaged in retaliation.

175. Kitchen respectfully prays that this Court adjudge Defendant liable for race discrimination in violation of Title VII, and grant all relief allowed under the law, as set forth in the Prayer in this Petition.

**COUNT VII**
**Violation of the Age Discrimination in Employment Act**
**29 U.S.C. § 621 et seq.**
**Age Discrimination**

176. Kitchen incorporates each and every foregoing and succeeding paragraph of this Petition as if fully set forth here.

177. Kitchen was an employee, and KCATA was an employer, within the meaning and coverage of the Age Discrimination in Employment Act (ADEA).

178. Kitchen is and was over 40 years old.

179. Kitchen was qualified for his position and was performing his position to the reasonable expectations of KCATA.

180. KCATA discriminated against Kitchen, including but not limited to moving his office, reassigning him to new supervisors, shutting him out of the work environment, and ultimately terminating him.

181. The circumstances suggest discrimination: among other things, Kitchen was not treated as well as similarly-situated younger coworkers; the demographics of KCATA's reduction in force strongly point towards older workers being the target of the RIF; and Kitchen was replaced by a younger person.

182.     KCATA has acted in reckless disregard of Kitchen's rights and/or with evil motive, justifying an award of liquidated damages for willfulness, as KCATA knowingly engaged in discrimination.

183.     Kitchen has given his consent to join this action.  *See* Ex. A, Notice of Consent to Join, attached and incorporated as if fully set forth here.

184.     Kitchen respectfully prays that this Court adjudge Defendant liable for age discrimination in violation of the ADEA, and grant all relief allowed under the law, as set forth in the Prayer in this Petition.

**COUNT VIII**
**Violation of 42 U.S.C. § 1983**
**Discrimination and Retaliation**

185.     Kitchen incorporates each and every foregoing and succeeding paragraph of this Petition as if fully set forth here.

186.     KCATA is a public agency and acted under color of law with respect to Kitchen's employment.

187.     KCATA's decisions regarding Kitchen were made and implemented by persons with policymaking authority, meaning they are attributable to KCATA for purposes of liability under 42 U.S.C. § 1983.

188.     Kitchen has federally-protected rights to be free of discrimination on the basis of race, association with persons with disabilities, and age, as well as to be free of retaliation for opposing such discrimination.

189.     Kitchen is Black, over 40, associated with and stood up for the rights of persons with disabilities, and opposed actual or reasonably-suspected racial discrimination.

190.    Kitchen was qualified for his position and was performing his position to the reasonable expectations of KCATA.

191.    KCATA discriminated and retaliated against Kitchen, including but not limited to moving his office, reassigning him to new supervisors, shutting him out of the work environment, and ultimately terminating him.

192.    The circumstances suggest discrimination and retaliation, as Kitchen was not treated as well as similarly-situated younger and White coworkers, and KCATA and its officials acted upset and took action after Kitchen stood up for people with disabilities and opposed Black employees being treated unfairly.

193.    Kitchen prays that this Court find Defendants liable for violation of 42 U.S.C. § 1983, and grant all relief permitted by law, as set forth in the Prayer in this Petition.

**COUNT IX**
**Violation of RSMo 105.055**

194.    Kitchen incorporates by reference the above listed paragraphs as if set forth fully herein.

195.    KCATA is a public employer, and Kitchen is a public employee, within the meaning of RSMo 105.055.

196.    Kitchen reported and disclosed what was or what he reasonably believed to be a violation of any law, rule or regulation; or mismanagement, a gross waste of funds or abuse of authority, violation of policy, waste of public resources, alteration of technical findings or communication of scientific opinion, breaches of professional ethical canons, or a substantial and specific danger to public health or safety, in that he disclosed that KCATA's failure to accommodate workers with disabilities and treat employees equally.

197.     This act of reporting by Kitchen constitutes a disclosure of alleged prohibited activity under RSMo 105.055.

198.     As a result of the reports, Defendant took disciplinary action against Kitchen by terminating him, including but not limited to moving his office, reassigning him to new supervisors, shutting him out of the work environment, and ultimately terminating him.

199.     Kitchen prays that this Court find Defendants liable for violation of RSMo 105.055, and grant all relief permitted by law, as set forth in the Prayer in this Petition.

**JURY DEMAND**

Plaintiff respectfully demands a jury trial on all issues so triable.

**PRAYER FOR RELIEF**

Plaintiff Michael Kitchen respectfully prays that the Court enter judgment in his favor and against Defendant KCATA, and grant all relief allowed under law, including but not limited to:

A.     Actual economic damages, including lost wages and benefits, adjusted for promotional opportunities lost;

B.     Actual non-economic damages, including damages for emotional distress;

C.     Punitive damages, liquidated damages, and civil penalties;

D.     Attorney's fees, expert fees, and costs;

E.     Reinstatement, backpay, and/or frontpay;

F.     An order that Defendant cease and desist from all discriminatory practices and revise Kitchen's personnel records to remove all negative references; and

G.     Any other and/or further relief permitted by law.

Electronically Filed - Jackson - Independence - December 08, 2020 - 10:42 PM

Dated: December 8, 2020    Respectfully submitted,

KEENAN & BHATIA, LLC

By: ___/s Sonal Bhatia & E.E. Keenan___
Sonal Bhatia, Mo. Bar No. 67519
Edward (E.E.) Keenan, Mo. Bar No. 62993
929 Walnut St., Ste. 200
Kansas City, MO 64106
Tel: (816) 809-2100
sonal@keenanfirm.com
ee@keenanfirm.com

*Attorneys for Plaintiff Michael Kitchen*

Electronically Filed - Jackson - Independence - December 08, 2020 - 10:42 PM

## NOTICE OF CONSENT TO JOIN

I, Michael Kitchen, pursuant to the Age Discrimination in Employment Act (ADEA) and the procedures for its enforcement, *see, e.g.,* 29 U.S.C. §§ 216(b), 626(b), and any other applicable laws, hereby give my consent to join as a party plaintiff in the action styled *Michael Kitchen v. Kansas City Area Transportation Authority*. I consent to and designate Keenan & Bhatia, LLC, and any attorneys with whom the firm affiliates, to act as my counsel in this action.

Signature

12-8-2020
Date

## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT INDEPENDENCE

**MICHAEL KITCHEN,**

|  |  |
|---|---|
| **PLAINTIFF(S),** | **CASE NO.  2016-CV24943** |
| **VS.** | **DIVISION 2** |

**KANSAS CITY AREA TRANSPORTATION AUTHORITY,**

**DEFENDANT(S).**

### NOTICE OF CASE MANAGEMENT CONFERENCE FOR CIVIL CASE AND ORDER FOR MEDIATION

NOTICE IS HEREBY GIVEN that a Case Management Conference will be held with the Honorable **KENNETH R GARRETT III** on **12-APR-2021** in **DIVISION 2** at **08:30 AM**.  All Applications for Continuance of a Case Management Conference should be filed on or before Wednesday of the week prior to the case management setting.  Applications for Continuance of a Case Management Conference shall comply with Supreme Court Rule and 16th Cir. R. 34.1. Continuance of a Case Management Conference will only be granted for good cause shown because it is the desire of the Court to meet with counsel and parties in all cases within the first 4 months that a case has been on file.  All counsel and parties are directed to check Case.NET on the 16th Judicial Circuit web site at www.16thcircuit.org after filing an application for continuance to determine whether or not it has been granted.

A lead attorney of record must be designated for each party as required by Local Rule 3.5.1.  A separate pleading designating the lead attorney of record shall be filed by each party as described in Local Rule 3.5.2.  The parties are advised that if they do not file a separate pleading designating lead counsel, even in situations where there is only one attorney representing the party, JIS will not be updated by civil records department, and copies of orders will be sent to the address currently shown in JIS.  Civil Records does not update attorney information from answers or other pleadings. The Designation of Lead Attorney pleading shall contain the name of lead counsel, firm name, mailing address, phone number, FAX number and E-mail address of the attorney who is lead counsel.

At the Case Management Conference, counsel should be prepared to address at least the following:

    a.       A trial setting;

    b.       Expert Witness Disclosure Cutoff Date;

    c.       A schedule for the orderly preparation of the case for trial;

    d.       Any issues which require input or action by the Court;

    e.       The status of settlement negotiations.

Case 4:21-cv-00036-FJG   Document 1-1   Filed 01/21/21   Page 28 of 37

**MEDIATION**

The parties are ordered to participate in mediation pursuant to Supreme Court Rule 17. Mediation shall be completed within 10 months after the date the case if filed for complex cases, and 6 months after the date the case is filed for other circuit cases, unless otherwise ordered by the Court. Each party shall personally appear at the mediation and participate in the process. In the event a party does not have the authority to enter into a settlement, then a representative of the entity that does have actual authority to enter into a settlement on behalf of the party shall also personally attend the mediations with the party.

The parties shall confer and select a mutually agreeable person to act as mediator in this case. If the parties are unable to agree on a mediator the court will appoint a mediator at the Case Management Conference.

Each party shall pay their respective pro-rata cost of the mediation directly to the mediator.

**POLICIES/PROCEDURES**

Please refer to the Court's web page www.16thcircuit.org for division policies and procedural information listed by each judge.

_/S/ KENNETH R GARRETT III_
KENNETH R GARRETT III**, Circuit Judge**

Certificate of Service

This is to certify that a copy of the foregoing was electronic noticed, faxed, emailed and/or mailed or hand delivered to the plaintiff with the delivery of the file-stamped copy of the petition. It is further certified that a copy of the foregoing will be served with the summons on each defendant named in this action.

Attorney for Plaintiff(s):
EDWARD EMMETT KEENAN, 1301 OAK ST, STE 510, KANSAS CITY, MO 64106

Defendant(s):
KANSAS CITY AREA TRANSPORTATION AUTHORITY

Dated: 09-DEC-2020                                    MARY A. MARQUEZ
                                                      Court Administrator

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT INDEPENDENCE**

MICHAEL KITCHEN,            )

                              )

        *Plaintiff,*         )    Case No.:    2016-CV24943

                              )

v.                        )

                              )    Division:    2

KANSAS CITY AREA TRANSPORTATION  )

AUTHORITY,                )

                              )

        *Defendant.*       )

## <u>REQUEST FOR SUMMONS</u>

Plaintiff respectfully requests that this Court issue its summons, directed to the

Defendant Kansas City Area Transportation Authority, for service by First-Class Mail.

Dated:  December 21, 2020        Respectfully submitted,

                                    KEENAN & BHATIA, LLC

                                    ___/s/ E.E. Keenan_____

                                    Edward (E.E.) Keenan, Mo. Bar No. 62993

                                    Sonal Bhatia, Mo. Bar No. 67519

                                    929 Walnut Street, Suite 5107

                                    Kansas City, MO  64106

                                    Tel:  (816) 809-2100

                                    ee@keenanfirm.com

                                    sonal@keenanfirm.com

                                    *Attorneys for Plaintiff Michael Kitchen*

## CERTIFICATE OF SERVICE

I certify service of the foregoing by efiling on November 13, 2020.


_____/s/ E.E. Keenan_____
An Attorney for Plaintiff

2



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>KENNETH R GARRETT III | Case Number: 2016-CV24943 |
| Plaintiff/Petitioner:<br><br>MICHAEL KITCHEN | Plaintiff's/Petitioner's Attorney/Address:<br>EDWARD EMMETT KEENAN<br> 1301 OAK ST<br>STE 510<br>KANSAS CITY, MO 64106 |
| vs. | |
| Defendant/Respondent:<br><br>KANSAS CITY AREA TRANSPORTATION<br>AUTHORITY | Court Address:<br>308 W Kansas<br>INDEPENDENCE, MO 64050 |
| Nature of Suit:<br>CC Employmnt Discrmntn 213.111 | (Date File Stamp) |

## Summons for Service by First Class Mail

The State of Missouri to: **KANSAS CITY AREA TRANSPORTATION AUTHORITY**
Alias:

**1200 E. 18 ST.**
**KANSAS CITY, MO 64108**



*COURT SEAL OF*

*JACKSON COUNTY*

　　　You are summoned and, within 30 days after the enclosed acknowledgment is filed, you must file an answer to the enclosed petition with the clerk of this court and also serve this answer upon Plaintiff's/Petitioner's attorney at the above address. If you fail to do so, judgment by default will be taken against you for the relief demanded in the petition.

22-DEC-2020
Date Issued

_____
Clerk

Further Information:

## Directions to Clerk

　　　The clerk should issue one copy of this summons for each Defendant/Respondent to be served by first class mail. Under Section 506.150.4, RSMo, service by first class mail may be made by Plaintiff/Petitioner or any person authorized to serve process under Section 506.140, RSMo.

OSCA (2-2017) SM80 (JAKSFCM) *For Court Use Only:* Document ID# 20-SFCM-188        1 of 2

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

Revised 7/3/13                    Service Information - Attorney

Electronically Filed - Jackson - Independence - December 23, 2020 - 01:10 PM



**IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI**

| Judge or Division:<br>KENNETH R GARRETT III | Case Number: 2016-CV24943 |
|---|---|
| Plaintiff/Petitioner:<br>MICHAEL KITCHEN | Plaintiff's/Petitioner's Attorney/Address:<br>EDWARD EMMETT KEENAN<br>1301 OAK ST<br>STE 510<br>KANSAS CITY, MO  64106 |
| **vs.** | |
| Defendant/Respondent:<br>KANSAS CITY AREA TRANSPORTATION<br>AUTHORITY | Court Address:<br>308 W Kansas<br>INDEPENDENCE, MO  64050 |
| Nature of Suit:<br>CC Employmnt Discrmntn 213.111 | (Date File Stamp) |

## Summons for Service by First Class Mail

**The State of Missouri to:  KANSAS CITY AREA TRANSPORTATION AUTHORITY**
                                          **Alias:**

**1200 E. 18 ST.**
**KANSAS CITY, MO  64108**



*COURT SEAL OF*

*JACKSON COUNTY*

          You are summoned and, within 30 days after the enclosed acknowledgment is filed, you must file an answer to the enclosed petition with the clerk of this court and also serve this answer upon Plaintiff's'/Petitioner's attorney at the above address.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the petition.

<u>22-DEC-2020</u>
Date Issued

_____
Clerk

          Further Information:

## Directions to Clerk

          The clerk should issue one copy of this summons for each Defendant/Respondent to be served by first class mail.  Under Section 506.150.4, RSMo, service by first class mail may be made by Plaintiff/Petitioner or any person authorized to serve process under Section 506.140, RSMo.

OSCA (2-2017) SM80 (JAKSFCM) *For Court Use Only:* Document ID# 20-SFCM-188                    1 of 2

Electronically Filed - Jackson - Independence - December 23, 2020 - 01:10 PM

**SUMMONS/GARNISHMENT SERVICE PACKETS**
**ATTORNEY INFORMATION**

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org  →  Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.

Circuit Court of Jackson County

RETURN ON SERVICE:

Pursuant to agreement by counsel for the parties, this Summons and the Petition (with Exhibit A) and Notice of Case Management Conference were served on Defendant by email to Defendant's counsel, W. Joseph Hatley, Esq., at jhatley@spencerfane.com, this 23rd day of December, 2020.

Edward (E.E.) Keenan
MO Bar No. 62993

Electronically Filed - Jackson - Independence - December 23, 2020 - 01:10 PM



**IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI**

| | |
|---|---|
| Judge or Division:<br>KENNETH R GARRETT III | Case Number: 2016-CV24943 |
| Plaintiff/Petitioner:<br>MICHAEL KITCHEN | Plaintiff's/Petitioner's Attorney/Address:<br>EDWARD EMMETT KEENAN<br>1301 OAK ST<br>STE 510<br>KANSAS CITY, MO 64106 |
| vs. | |
| Defendant/Respondent:<br>KANSAS CITY AREA TRANSPORTATION AUTHORITY | Court Address:<br>308 W Kansas<br>INDEPENDENCE, MO 64050 |
| Nature of Suit:<br>CC Employmnt Discrmntn 213.111 | (Date File Stamp) |

## Summons for Service by First Class Mail

**The State of Missouri to: KANSAS CITY AREA TRANSPORTATION AUTHORITY**
   **Alias:**

**1200 E. 18 ST.**
**KANSAS CITY, MO 64108**



*COURT SEAL OF*

*JACKSON COUNTY*

       You are summoned and, within 30 days after the enclosed acknowledgment is filed, you must file an answer to the enclosed petition with the clerk of this court and also must serve this answer upon Plaintiff's/Petitioner's attorney at the above address. If you fail to do so, judgment by default will be taken against you for the relief demanded in the petition.

<u>22-DEC-2020</u>
Date Issued

_____
Clerk

Further Information:

---

### Directions to Clerk

   The clerk should issue one copy of this summons for each Defendant/Respondent to be served by first class mail. Under Section 506.150.4, RSMo, service by first class mail may be made by Plaintiff/Petitioner or any person authorized to serve process under Section 506.140, RSMo.

Electronically Filed - Jackson - Independence - December 23, 2020 - 01:10 PM

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.

Circuit Court of Jackson County

RETURN ON SERVICE:

Pursuant to agreement by counsel for the parties,
this Summons and the Petition (with Exhibit A) and Notice
of Case Management Conference were served on
Defendant by email to Defendant's counsel,
W. Joseph Hatley, Esq., at jhatley@spencerfane.com,
this 23rd day of December, 2020.

Edward (E.E.) Keenan
MO Bar No. 62993

Revised 7/3/13
Service Information - Attorney